

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

)
JEROME MAHER,                        )
                                     )
            Plaintiff,               )        No.  03 C 3421
                                     )
      v.                             )        Magistrate Judge Jeffrey Cole
                                     )
CITY OF CHICAGO,                     )
                                     )
            Defendant.               )
                                     )

## MEMORANDUM OPINION AND ORDER

### I.
### BACKGROUND OF THE LITIGATION

This is a suit under the Veterans' Reemployment Rights Act of 1974 ("VRRA") and the Uniformed

Services Employment and Reemployment Rights Act ("USERRA")(Count I) – the two federal statutes that

protect the reemployment rights of veterans – and Illinois' Public Employee Armed Services Rights Act

(Count II).  Count I seeks to portray the plaintiff as having suffered more than a decade of calculated,

consistent harassment by the defendant because of his participation in the Naval Reserves-- first, in the Gulf

War and later in Bosnia – all of which created a hostile work environment. (*Pl.Mem in Opposition to*

*Motion for Summary Judgment* at 9).

Hostile environment claims are different in kind from discreet acts.  Their very nature involves

repeated conduct, and they are based on the cumulative effect of individual acts. *See Diaz-Gandia* v.

*Dapena-Thompson*, 90 F.3d 609, 615 (1st Cir. 1996)(there was a "trialworthy issue of material fact as to

whether the cumulative effect of these adverse employment actions was enough 'like demotion' to be

actionable under VRRA"). *Cf., National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 724 (7th Cir. 2004). It is the plaintiff's further contention that following his return from the first Gulf War in 1991, he was not restored to the position of Assistant Commissioner in the City's Aviation Department, and that following his return from service in Bosnia in 1996, he was demoted. These purported demotions are the obverse side of the argument that he was improperly passed over for promotion in favor of those with lesser merit. All this occurred, Mr. Maher contends, as a consequence of his military service.

The story begins with his hiring in 1990 by the Aviation Department of the City of Chicago and chronicles his claimed mistreatment by the City over the next decade in a single, undifferentiated count, rather than in multiple counts, corresponding to what arguably could be pled as separate violations. *See* Rule 10(b), Federal Rules of Civil Procedure. ("Each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth"). The City, raising no objection to this mode of pleading, has moved for summary judgment on Counts I and II. At bottom, it argues that there is no genuine disputed issue of material fact on the questions of whether the plaintiff suffered an adverse employment action, was denied reemployment to his former position upon his returns from military service, or was demoted. Finally, the City argues that plaintiff is guilty of laches, requiring entry of judgment in its favor.

## II.
## THE STATUTORY FRAMEWORK:
## THE VETERANS' EMPLOYMENT RIGHTS STATUTES

The amended complaint is brought under the "Veterans' Re-Employment Rights Laws," [sic] as

codified at 38 U.S.C. §§ 4301-4333.[1] (*Amended Complaint*, Count I). The plaintiff's citation actually

encompasses two statutes, the Veterans' Reemployment Rights Act of 1974 ("VRRA") and the Uniformed

Services Employment and Reemployment Rights Act ("USERRA"). Both statutes were enacted for the

purpose of prohibiting discrimination motivated by participation in military service and provide that

individuals inducted into the military shall be reemployed in their former positions within a certain period of

time. *Bowlds v. General Motors Mfg. Div. of General Motors Corp.*, 411 F.3d 808, 810 (7th Cir.

2005).[2]

The VRRA was enacted pursuant to the Vietnam Veterans' Readjustment Assistance Act of 1974.

*Lapine v. Town of Wellesley*, 304 F.3d 90, 93 (1st Cir. 2002). Given its salutary purposes, it is to be

liberally construed. *Alabama Power Co. v. Davis*, 431 U.S. 581 (1977). It provides, in pertinent part,

that "[a]ny person [employed by a state or private employer] shall not be denied... retention in employment,

or any promotion or other incident or advantage of employment because of any obligation as a member of

---

[1] The VRRA was originally codified at 43 U.S.C. § 2021, *et seq*. In 1992, the VRRA was renumbered, pursuant to the Veterans' Benefits Act of 1992, at 38 U.S.C. § 4301, *et seq*. When the Uniformed Services Employment and Reemployment Rights Act ("USERRA") was enacted, significantly amending the VRRA, the provisions of the VRRA were transferred and renumbered as §§ 4301-4307 of the USERRA.

[2] Count II is brought under Illinois' Public Employee Armed Services Act. 5 ILCS 330/1 *et seq*. While the Act covers only public employees, it is otherwise much like the VRRA or the USERRA in that it protects the rights of employees activated in the armed services to insurance coverage, pension rights, and employment and promotion rights. 5 ILCS 330/2; 330/5. The City seeks summary judgment on this count as well and argues that because the plaintiff does not specifically address the statute in his response brief, his state law claim must be deemed waived. *See Laborers' Intern. Union of North America v. Caruso*, 197 F.3d 1195, 1197(7th Cir. 1999)(finding argument *not presented* in response to summary judgment motion waived). The City itself spends just three scant sentences on the claim, however, simply noting that the plaintiff's claims under the Act are based on the same actions and fail for the same reasons as his VRRA and USERRA claims fail. Under these circumstances, the waiver doctrine would be misapplied.

a Reserve component of the Armed Forces." 38 U.S.C. §2021(b)(3). The legislative history of §2021(b)(3) reflects that the VRRA "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely* by reserve status." *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559 (1981) (Emphasis supplied). *See also Diaz-Gandia*, 90 F.3d at 613.

In 1991, Congress enacted USERRA pursuant to the War Powers Clause to encourage non-career military service, to minimize disruptions in the lives and communities of those who serve in the uniformed services, and to prohibit discrimination against persons because of their service in the uniformed services. 38 U.S.C. § 4301(a). *See Bowlds*, 411 F.3d at 810; *Bedrossian v. Northwestern Memorial Hosp.*, 409 F.3d 840, 843-44 (7th Cir. 2005). Like the VRRA, USERRA is to be broadly construed in favor of its military beneficiaries. *TVA v. Hill*, 437 U.S. 153 (1978); *McGuire v. UPS*, 152 F.3d 673, 676 (7th Cir. 1998).

Section 4311(a) of the USERRA provides in substance that a person who has performed service in the military shall not be denied initial employment, reemployment, retention in employment, or any promotion or any benefit of employment on the basis of that service. Section 4311(b) prohibits an employer from discriminating in employment or taking any adverse employment action against a person because such person has taken an action to enforce a protection accorded under the Act. USERRA also empowers the Attorney General, acting on a plaintiff's behalf, to sue where an employer has failed or refused or is about to fail or refuse to comply with the Act. 38 U.S.C. §§ 4322-23.

At least for purposes of this case, the USERRA's principal innovation is that Congress replaced the "sole cause" standard of the VRRA with a far more relaxed standard under which an employee need only

4

show that his membership in the uniformed services "is *a motivating factor* in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service." 38 U.S.C. § 4311(c)(1) (Emphasis supplied). *See also id.* at 4311(c)(2); *Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7ᵗʰ Cir. 2002).[3]

The USERRA applies only to causes of action that accrued "on or after the first day after the sixty-day period beginning on October 13, 1994. USERRA, Pub.L. No. 103-353 § 8(a); *Bowlds*, 411 F.3d at 811. Congress did not direct the courts to apply the USERRA retroactively, and the Supreme Court has held that courts should be extremely hesitant to apply a statute retroactively, where Congress has not expressly mandated such an extension. *See generally, Hughes Aircraft v. United* States, 520 U.S. 939 (1997). Consequently, the Seventh Circuit, like its sister circuits, has held that the USERRA cannot be applied retroactively. *See Bowlds*, 411 F.3d at 811; *Lapine*, 304 F.3d at 93; *Fernandez v. Dep't of the Army*, 234 F.3d 553, 557 (Fed.Cir.2000); *Newport v. Ford Motor Co.*, 91 F.3d 1164, 1167 (8ᵗʰ Cir.1996).[4]

Thus, the "sole cause" standard under the VRRA applies to claims accruing before December 14,

---

[3] Congress intended that the case law developed under the VRRA aid in interpreting the USERRA. See H.R.Rep. No. 103-65, at 19-21 (1993), reprinted in 1994 U.S.C.C.A.N. 2449, 2454 ("[T]he Committee wishes to stress that the extensive body of case law that has evolved over that period, to the extent it is consistent with the provisions of this Act, remains in full force and effect in interpreting those provisions."). *Rogers v. City of San Antonio*, 392 F.3d 758, 762 (5ᵗʰ Cir. 2004).

[4] Plaintiff also argues that, at the time he "filed his lawsuit, retroactive application of the USERRA was at best an open issue," citing *Miller v. City of Indianapolis*, 281 F.3d 648, 653 (7ᵗʰ Cir. 2002). But *Miller* clearly pointed to a different conclusion. (". . . if called upon to, we would determine, as have other courts, that USERRA does not have retroactive application."). And *Pfeiffer v. Caterpillar*, (N.D.Ill. 2000) did not discuss the retroactivity of the USERRA, and the downgrade in pay occurred in 1995, after the effective date of the USERRA. 2000 WL 310312 at *3, 13.

5

1994, while the "a motivating factor" standard of the USERRA applies to claims accruing thereafter. Since the amended complaint claims spans the period from February 1991 through March 1998, some claims fall under VRRA, and some fall under USERRA.

## III.
## SUMMARY JUDGMENT PRINCIPLES AND "SELF-SERVING" EVIDENCE

### A.
### General Principles

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Bowlds*, 411 F.3d at 810. A dispute over material facts is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ballance v. City of Springfield, Illinois Police Dept.*, 424 F.3d 314 (7th Cir. 2005).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. But there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." *Id.* at 324. The burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the

nonmoving party's case. *Id.* The critical point – and the one often forgotten – is that summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial. *Rozskowliak v. Village of Arlington Heights*, 415 F. 3d 608, 612 (7th Cir. 2005). In that situation, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23. *See also Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Holbrook v. Norfolk Southern Railway Co.*, 414 F.3d 739 (7th Cir. 2005).[5]

In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Matsushita Electric Industries v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bowlds*, 411 F.3d at 810. But, neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, is sufficient to defeat a motion for summary judgment. *McGuire v. United Parcel Service*, 152 F.3d 673, 676 (7th Cir. 1998); *Mills v. First Federal Savings & Loan Ass'n. Of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50; *Unterreiner v.*

---

[5] Under both Acts, Mr. Maher bears the burden of demonstrating by a preponderance of the evidence that he was harassed, that the harassment created a hostile work environment, and that he was either demoted or not promoted as a consequence of his military service. Depending on the time period involved, the burden will vary. The City will have the burden of demonstrating that the complained of actions would have been taken even in the absence of Mr. Maher's military service. *See Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005); *Sheahan v. Dept. of the Navy*, 240 F.3d 1009, 1014 (Fed.Cir. 2001); *Fink*, 129 F.Supp.2d at 515; 38 U.S.C. § 4311(c)(1).

*Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir 1993). Inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion. *Holbrook v. Norfolk Southern Railway* Co., 414 F.3d 739 (7th Cir. 2005); *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 463 (7th Cir. 2005); *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In a summary judgment context, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented. *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 726 (7th Cir. 2005); *Durkin v. Equifax Check Services*, 406 F.3d 410, 414 (7th Cir. 2005).

## B.
## The Objection That Evidence Is "Self-Serving"

Rule 56(e) requires that supporting and opposing affidavits shall be made on personal knowledge and shall set forth facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein. One of the more commonly raised objections to "evidence" adduced in support of or in opposition to a summary judgment motion is that the document or testimony is "self-serving," and thus, cannot create a genuine issue of material fact. *Hall v. Bodine Electric Co.*, 276 F.3d 345, 354 (7th Cir. 2002). The objection that evidence is "self-serving" requires some explanation since its very felicity has led to uncritical repetition and misapplication. *Compare Tiller v. Atlantic Coastline R. Co.*, 318 U.S. 54, 68 (1943)(Frankfurter, J., concurring)("A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula indiscriminately used to express different and sometimes contradictory ideas.").

8

All testimony – and all documents – offered by or on behalf of a party may fairly be said to be self-serving; why else would they be offered. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003); *United States v. Bucur*, 194 F.2d 297, 301 (7th Cir. 1952). As Learned Hand long ago showed, there is no rule of evidence that warrants, let along requires, exclusion on the ground that the evidence is self-serving. *See United States v. Matot*, 146 F.2d 197, 198 (2d Cir. 1944) (L.Hand, J.); *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005)(Easterbrook, J.); *Dalton v. Battaglia*, 402 F.3d 729, 734-35 (7th Cir. 2005); *Payne*, 337 F.3d at 772 (7th Cir. 2003)(summary judgment affidavits not excludable because "self-serving.").[6]

Properly understood, the objection that evidence is self-serving is a shorthand way of saying that it lacks an appropriate evidentiary foundation in the record, that it is conclusory, that it is not based on personal knowledge as required by Rule 602, Federal Rules of Evidence, or that the evidence is hearsay.[7] As the Fourth Circuit has said, the objection that the evidence is self-serving "is a misnomer that ought to be interred. It has long obscured the proper application of the hearsay rule to the reception of evidence, and is not an independent ground for objection." *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 972 (4th Cir. 1971). *Accord Chicago Milwaukee St. Paul and Pacific RR v. Alva Coal Corp.*, 365 F.2d 49, 56 (7th Cir. 1966). It is in the sense discussed above that the term is used here.

---

[6] Statements of motive, intent and mental state, admissible under Rule 803(3), are not excludable even when highly self-serving. *United States v. DiMaria*, 727 F.2d 265, 271 (2nd Cir. 1984) (Friendly, J.).

[7] Evidence must be admissible under the Federal Rule of Evidence. *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 429 (7th Cir. 2004).

9

# IV.
## STATEMENT OF FACTS [8]

### A.
### The Beginning And Nature Of Plaintiff's Employment

The threshold dispute involves the plaintiff's status when he was hired by the Aviation Department

of the City of Chicago in 1990, for his claims of demotion are bottomed on the contention that he was an

Assistant Commissioner, not, as the City contends, the Director of Development Finance. (*Defendant's*

*Local Rule 56.1(A)(3) Statement* ("*Def.St.*"), ¶¶ 11-12; *Defendant's Answer to Plaintiff's 56.1(b)(3)(B)*

*Statement*, ¶ 8); (*Plaintiff's Local Rule 56.1(b)(3)(A) Response* ("*Pl.Rsp.*"), ¶ 11; *Plaintiff's Local Rule*

*56.1(b)(3)(B) Statement* ("*Pl.St.*"), ¶ 8). The plaintiff conceded at his deposition that there are no

documents supporting his claim that he was hired as an Assistant Commissioner – and that the claim is based

solely on what he says he was told during one of his pre-hiring interviews by Jerome Smith, the Deputy

Commissioner of Finance, and Michael Broderick. According to Mr. Maher, they told him that while "he

was to be an Assistant Commissioner," there was no "budgetary title" for that position, and it was too late

to budget for one for 1991. Thus, he said that he agreed to be brought on board as "Director of

Development Finance," at an annual salary of $43,128. (*Pl.Rsp.* ¶11; Ex. 6, *Pl.Dep.* 33-34, 288).[9]

Although Mr. Smith did not have decision-making authority, he did recommend that plaintiff be hired. (Smith

Dep. at 29). At his deposition, Mr. Smith said he thought "Assistant Commissioner" might have been

---

[8] The following factual recitation does not address questions of admissibility. They are dealt with in Argument V.

[9] The business records of the City of Chicago confirm that Mr. Maher was hired as the Director of Development Finance. (*Def.St.*; Ex. 10; Ex. 10-1; May Aff. ¶ 4).

plaintiff's formal *title*, but it was "all kind of cloudy to [him]." (*Pl.St.*, Ex. 4, Smith Dep. at 6, 29, 47); (*Pl. Rsp.*, ¶33; Ex. 9).[10]

Mr. Maher's duties "were to supervise both the revenue section and the expense or disbursement section and, initially, the grants section of finance administration and, initially, parts of administration, and then to develop a new rates and charges model for the Department of Aviation to work with our outside public accountants in the development of this rates and charges model." (*Def.St.*, Ex. 1, Plaintiff's Dep. at 34-35, 288, 361; *Pl.St.*, ¶ 8, Ex. 6). He directly supervised three people, although he may actually have been in charge of "twenty-some people" in a "chain of command." (Plaintiff's Dep. at 36, 119).

Judith Hamill, who was the an assistant to the First Deputy Commissioner of the Department of Aviation, (*Pl.St.*, Ex. 5, Hamill Aff.), testified that she was told the plaintiff was an assistant commissioner of finance and that she observed the plaintiff exercising authority and undertaking responsibilities that she felt were "commensurate" with the position of Assistant Commissioner. (Hamill Aff.¶¶ 7-8, 17).

## B.
## The Plaintiff's First Deployment in 1991 in the First Gulf War

Plaintiff's tenure with the Aviation Department was without incident from the time he was hired in August, 1990 until called to active duty on February 12, 1991, in the first Gulf War. It was at this point that Mr. Smith, who was plaintiff's supervisor, asked him whether he could "get out of" his military duty and told him, "You volunteered for this. This will cause great inconvenience, harm to the City." Plaintiff scotched this idea, but Mr. Smith continued to argue with plaintiff over whether he could somehow avoid his deployment to the Gulf. He allegedly told the plaintiff that his military service was causing great hardship

---

[10] At his deposition, Mr. Smith was asked about the "title" Mr. Maher enjoyed, not the duties he performed. (Dep at 47).

to the City, and that plaintiff should resign. (Plaintiff's Dep., at 42). After that, Mr. Smith confronted plaintiff about his military service on a daily basis. When plaintiff finally complained about this treatment to Michael Cummings, the Assistant Commissioner of Personnel, he was told that he should go and serve, and that his job would be there when he returned. (*Def.St.*, ¶¶ 16-20; *Pl.Rsp.*, ¶¶ 16-20).

On September 30, 1991, when he returned, he was told that he needed his discharge papers to continue his employment with the City. When he returned with the papers a week later, Jacqueline Jones, of the committee on finance, informed him that he had two weeks' leave from the City due him. Plaintiff took the time off that he assumed he was entitled to, but he was docked nine days of pay for unauthorized absence. Elvira Fury of the aviation department told him that his leave was to have begun September 30, 1991 – the date of his discharge from duty – and not the date he returned to the office with his discharge papers. (*Defendant St.*, ¶¶ 21- 24; *Pl.Rsp.*, ¶¶ 21-24).

Mr. Smith purportedly resumed where he left off: he continued to berate Mr. Maher, asked him to resign, and said that he was close to being fired. (*Defendant St.*, ¶ 25; *Pl.Rsp.*, ¶ 25). He chastised plaintiff for being gone and told him he was no longer "up to speed" with what was going on in the Department. Plaintiff was instructed to report to a former subordinate, Fred Kaplan, who, by then, was the Director of Aviation Revenue and Collection. (*Defendant St.*, ¶ 26; *Pl.Rsp.*, ¶ 26; Plaintiff Dep. at 77-78). When he complained to Mr. Cummings, he was told to take up the issue with James Balcer, then Director of Veterans' Affairs. Mr. Balcer recommended that plaintiff file a charge with the Department of Labor. He did so on August 12, 1992.[11] John Harris – then First Deputy Commissioner and a former Army Captain

---

[11] Mr. Maher's charge arguably had a somewhat different cast than his present complaint. It claimed that he had been unjustly accused of disclosing confidential information because of his military
(continued...)

12

– asked plaintiff to withdraw the charge, promising to "try to make right with you on these issues." In the end, plaintiff did just that, withdrawing his charge in December of 1992. At that time, the investigator for the Department of Labor told him that if things got bad again, he could reopen his charge. (*Defendant St.*, ¶¶ 28-31; *Pl.Rsp.*, ¶¶ 28-31). He never did.

On October 1, 1991, the day after he returned to work, Mr. Maher was reappointed as Director of Finance at a salary of $49,440 – a more than $6,000 increase. (*Def.St.*, Ex. 10, May Aff. ¶ 7). Documents authored and used by Mr. Maher in opposition to the City's motion demonstrate that between 1991 and 1993 he held himself out as the Director of Revenue. (*Pl.Rsp,.* ¶; Ex. 9). Also included was a 1992 memo from the deputy commissioner of aviation addressed to plaintiff as "director of aviation revenue."

## C.
### The Reorganization Of The Aviation Department In 1993

In early 1993, the Aviation Department underwent a reorganization, and, according to the City, the plaintiff's job title changed to "manager of finance," although Mr. Maher claims that this time his title did not change, and he remained a Director. Mr. Maher's pay grade was unaffected, he received another $6,000 salary increase to $54,840 per year, and the number of subordinates whom he directly supervised tripled.[12] Following the reorganization – and there is no claim that the reorganization was pretextual – he performed

---

[11](...continued)
service, that he was publicly humiliated by his superiors, and that he had been denied advancement by his superiors, not that he had been demoted to Director of Development Finance. Mr. Maher was hired in August of 1990 and left for military service six months later. Thus, any claim of denial of advancement would seem particularly pretextual. But these are matters for a jury.

[12] At one point in his deposition, Mr. Maher put the number of direct reports at 8,9, or 10 before Bosnia. (Plaintiff's Dep. at 207).

the work of Director of Revenue and aviation cash management or cash collections. (Plaintiff's Dep. at 117-18). (*Def.St.*, ¶ 33; Ex. 10, May Aff. ¶ 5). He was in charge of accounts receivable, and "developing a liaison relationship with the City Comptroller's Department" in order to effect the collection of past due accounts the airlines and concessionaires owed the City. He also re-wrote the "rates and charges model." He was not responsible for the "disbursement side of the house;" those duties were split among three departments. (Plaintiff's Dep. at 120-21).[13]

Mr. Maher's new supervisor, Hugh Murphy, allegedly took up where Mr. Smith left off, and began harassing him about his military commitment. On one occasion, Mr. Murphy interrupted a naval security clearance interview plaintiff was undergoing in his office "about every ten minutes." Mr. Murphy was upset when plaintiff went to his annual training, asking him if it was absolutely necessary. He did not respond when plaintiff requested that his permanent title be Assistant Commissioner or Director of Revenue; he merely glared at plaintiff. (*Def.St.*, ¶¶ 35-36; *Pl.Rsp.*, ¶¶ 35-36; Plaintiff's Dep. at 123-27). Plaintiff also claims that Mr. Murphy had one of his assistants jam plaintiff's office with files to the point where plaintiff could not open the door. (*Def.St.* ¶ 39; *Pl.Rsp.*, ¶ 39).

By October, 1993, the plaintiff was reporting to Dwayne Hawthorne, who happened to be a military veteran. Despite hopeful beginnings, things degenerated and Mr. Hawthorne harassed him as well because of his membership in the Naval Reserves. Mr. Hawthorne disparaged the military on numerous occasions, told plaintiff he was too old to be in the military, and harassed him when he went on active duty. Mr.

---

[13] Plaintiff characterizes this change in the wake of the reorganization as a demotion. This claim is based on the premise that he was hired as an Assistant Commissioner. From this he reasons, that he was deprived of the salary differential between a director and assistant commissioner and that he was not "eligible" for deputy positions that otherwise he could have been "considered for." (*Pl.Dep.* at 361-62).

Hawthorne rebuffed plaintiff when he complained about the files stacked in his office. He also called plaintiff continuously when he was doing a leadership course for the Naval Reserves, which almost resulted in plaintiff being discharged from the course. When Mr. Maher complained, he was rebuffed once more, by Mr. Hawthorne, who assured him he would "fix his ass." (*Def.St.*, ¶¶ 37-41; *Pl.Rsp.* ¶¶ 37-41).

In the period 1993 - 1994, plaintiff met regularly with Mr. Cummings, who repeatedly told him in substance that his military service prevented promotion. He quoted Mr. Cummings as saying that his "continued involvement with the reserves [was] hampering or detrimental to [him] getting anywhere in this department." (*Def.St.*, at ¶ 32; *Pl.Rsp.* at ¶ 32; Plaintiff's Dep. at 134). When other positions outside the Department of Aviation were posted, plaintiff did not apply. (*Def.St.* ¶ 56; *Pl.Rsp.* ¶ 56). He claimed he wanted to stay in aviation, because he had been told things would improve, and (somewhat inconsistently) he blamed his failure to have asked for positions outside the department on Mr. Cummings and Tim McCarthy, who told him in 1995 he "was trapped" in the department and in 1997 that he would not be promoted. (*Def.St.* ¶ 56; *Pl.Rsp.* ¶ 56; Plaintiff Dep. at 295-96).

## D.
### Plaintiff's Second Deployment In 1996

On August 2, 1996, plaintiff was informed that he was being called to active duty in Bosnia. He immediately notified the City. During the eight days leading up to his departure, Mr. Hawthorne harassed him, telling him that he "should quit his job" and that it was unfair to the City that he was leaving. He also falsely accused plaintiff of volunteering for the mission. (*Def.St.*, ¶ 43; *Pl.Rsp.* ¶ 43). Harassment of this nature occurred on a daily basis until plaintiff left. (Plaintiff's Dep. at 207).

Plaintiff returned from Bosnia on May 9, 1997, and went back to work on May 12, 1997. He

15

alleges that upon his return Mr. Hawthorne would not assign him to his former duties. (*Def.St.*, ¶ 46). He was told to report to Assistant Manager Jeff Crosby, who had assumed plaintiff's duties in his absence. (Plaintiff's Dep. at 226). The plaintiff's duties at this point were "clerical in nature" such as preparing spreadsheets. (Plaintiff's Dep. at 226). Mr. Hawthorne also threatened that plaintiff would lose his differential pay. (*Def.St.*, ¶ 46). He never did, and was so informed by Dennis Morrisey, who worked in Aviation's personnel section. (*Def.St.*, ¶ 46; *Pl.Rsp.*, ¶ 46).

Within ten weeks of his return, on July 23, 1997, Mr. Hawthorne restored plaintiff's former duties in a written memorandum to the staff. There were, however, two projects that plaintiff no longer supervised. In addition, two of plaintiff's staff – who were responsible for those projects – were assigned to report directly to Mr. Hawthorne. (*Pl.Rsp.*, ¶ 47; *Def.St.* ¶47; *Plaintiff Dep.*, at 230-32; Ex. 12). This still left the number of individuals over whom he had "direct supervision" at about eight. (*Plaintiff's Dep.* at 207).

In May 1997, plaintiff met with Robert Repel, First Deputy Commissioner of Legal Affairs, to discuss his claimed lack of promotion and his desire to be promoted to Deputy Commissioner, as well as a number of other positions. Mr. Repel said he would see what he could do. At a subsequent meeting a month later, plaintiff again asked about a deputy commissionership, and Mr. Repel (according to the plaintiff) said he "really in good conscious [sic] couldn't recommend [him] for either a deputy commissionership or assistant commissionership [as]... it would not be fair to promote plaintiff because someone else had to do his job while he was 'off gallivanting in Bosnia.'" (*Def.St.* ¶ 54; *Pl.Rsp.* ¶ 54; Plaintiff Dep. at 152-54). When plaintiff then complained to the Assistant Commissioner of Personnel, Tim McCarthy, he was told there was nothing that could be done. (Plaintiff's Dep. at 155).

**E.**

**Plaintiff's Transfer In 1998 To His Present Position In Landside Operations**

In January of 1998, plaintiff was transferred to Landside Operations, where he remains today. He claims that he no longer has any staff and no one to supervise. (*Def.St.*, ¶ 49; *Pl.Rsp.*, ¶¶ 48-49; *Plaintiff's Dep.* at 247). His former staff was transferred to the supervision of John Gill, who was given plaintiff's office as well. (*Pl.St.*, ¶ 16; *Hamill Aff.* ¶ 18). Plaintiff submits that Mr. Gill was unqualified to take over the position plaintiff left when he was transferred to Landside Operations, because unlike him, John Gill did not have a degree in finance or accounting. (*Pl.St.*, ¶¶ 16-17). Plaintiff suspected that this move was occasioned by his commanding officer contacting the City and trying to resolve the issue. His supervisor in Landside Operations, John Plezbert, told him that management deemed him a troublemaker, and counseled him to "wait it out" until management changed. (Plaintiff Dep. at 247-50).

At his deposition, Mr. Maher testified that his duties included the following and a good deal more: reviewing contracts for Landside operations, reviewing bills for contract compliance, and developing schedules for budgetary analysis, study of alternative methods of bringing in air freight, ways to relieve air traffic congestion, and alternative snow removal options. (*Def.St.*, ¶ 49; *Pl.Rsp.*, ¶ 49; *Pl.Dep.* at 247-49). The plaintiff, however, contends that these duties are not policy-based and thus, constitute a diminishment of his former responsibilities. (*Pl.Rsp.*, ¶ 49).

In 2003, the plaintiff's membership in the American Association of Airport Executives, which had been paid for by the City, was canceled when the City refused to continue its subsidy. (*Pl.Rsp.*; Ex. 11, Plaintiff's Aff. ¶ 18; Ex. 13). In addition, in mid-1999, the City changed plaintiff's continuous service date of August 16, 1990, to September 20, 1991, causing him to lose 13 months of seniority. (*Pl.St.*, ¶ 20).

While the City states that plaintiff's correct continuous service date is, indeed, August 16, 1990, it claims that the change – which apparently did occur – was not done deliberately. (*Def.Rsp.*, ¶ 20). The documents upon which plaintiff relies do show the date was changed, but the note which plaintiff contends demonstrates the change was deliberate is not authenticated and appears to be inauthentic. (*Pl.St.*, Ex. 23). In any event, this was corrected, although not until after plaintiff filed suit. (*Pl.St.*, ¶ 20; Ex. 6, Plaintiff's Dep. at 331).

## V.
## THERE ARE GENUINE ISSUES OF MATERIAL FACT PREVENTING THE GRANTING IN FULL OF THE CITY'S MOTION FOR SUMMARY JUDGMENT

### A.
### Mr. Maher's Status At The Time Of His Hiring In 1990 And His Return In 1991 From The First Gulf War

#### 1.

It is plaintiff's contention that when he returned in August 1991 from service in the Gulf, he was *demoted* from Assistant Commissioner to Director of Development Finance. In analyzing the claim it is essential at the outset to note its precise contours: Mr. Maher does not contend that his salary was decreased–he got a $6,000 salary increase–or that his duties were diminished or altered. They were not. Nor does he claim that the duties of an Assistant Commissioner differed from those of Director of Development Finance or that the City breached a pre-hiring *promise* to make him an Assistant Commissioner. Rather, his claim is that he "was hired into the position of Assistant Commissioner" in 1990 and that when he returned in 1991, he was the Director of Finance Development. (*Pl.St.*, ¶8). The claim is based on statements he claims were made in a pre-hiring interview he had with Broderick and Smith, which, for purposes of the present motion, it must be assumed were made. *Cf.*, *Volovsek v. Wisconsin*

18

*Department of Agriculture, Trade, and Consumer Protection*, 344 F. 3d 680, 690 (7th Cir. 2003). If the statements are hearsay, they are not competent evidence and cannot be considered. If they are admissible, their import must be considered.

At least arguably, the statements might escape the hearsay rule if deemed an offer or promise, or other statement having legal consequences flowing from the fact that the words were said. This is the familiar verbal act doctrine. *Twin City Fire Insurance Co. v. County Mutual Insurance Co.*, 23 F.3d 1175, 1182 (7th Cir. 1994)(Posner, C.J.); *United States, v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999)(Posner, C.J.). But there is no claim by Mr. Maher of a breached promise of a position in the future, and Mr. Maher's proof is insufficient to create a genuine issue of fact that Mr. Smith's statement was an *offer* that actually resulted in a contract. *Echo Acceptance* v. *Household Retail Services*, 267 F.3d 1068, 1087-88 (10th Cir. 2001)(verbal act doctrine not applicable where the statements did not result in a contract).

Alternatively, the statements could be viewed as party admissions and thus, non-hearsay under Rule 801(d)(2)(C) or (D). In any case, however, there must be proof that the statements were within the actual or apparent scope of Broderick and/or Smith's authority, and the burden is on Mr. Maher to demonstrate the scope of that authority. *Davis Companies, Inc. v. Emerald Casino, Inc.*, 2003 WL 22113414 at *4 (N.D.Ill. 2003). If the statements were not within their actual or apparent authority, they were not binding on the City, and Mr. Maher's claim of initial demotion as he has structured it fails. However, it is not necessary for a statement to be within the scope of the declarant's agency or employment that the declarant be a direct decision-maker. 5 McLaughlin, Weinstein's Federal Evidence §801.33[2][c] (2d ed. 2005).

The evidence is sufficient to create a genuine issue of material fact regarding the authority of at least Mr. Smith to have made the statements claimed by Mr. Maher. Under Rule 801, if the declarant was an

19

advisor or other significant participant in the decision making process that is the subject matter of the statement, the declarations by that person qualify as party admissions. *Cf. Weinstein's, supra.; Williams v. Pharmacia*, 137 F.3d 944, 950-951 (7ᵗʰCir. 1998). Mr. Smith, who became Mr. Maher's supervisor and was the Deputy Commissioner of Finance, recommended that Mr. Maher be hired. Thus, the claimed statements by Mr. Smith qualify as non-hearsay under Rule 801(d)(2)(D). [14]

But that does not mean that the statements are sufficient to raise a genuine issue of fact on the question of whether Mr. Maher was "hired into" the job of Assistant Commissioner. The statements were made at a pre-hiring interview with non-decision makers. Smith had no hiring authority, and there is no proof that the statement that Mr. Maher "was to be an Assistant Commissioner" was known to those making the actual hiring decision or indeed that it was part of the actual offer. Mr. Maher has not offered proof of what the ultimate employment deal agreed to by both parties actually was – that is, what was offered and what was accepted.

All that is clear (for present purposes) is that he was told in an interview–one of several he had with various people–that his *title* "was to be" Assistant Commissioner, and that budgetary constraints through 1991 would prevent him from having that *title* when he came on board. Mr. Maher's further proof is that he agreed to and did assume the job and title of Director of Development Finance – the position reflected

_____

[14] The testimony upon which he relies for his version of his hire – that of Timothy McCarthy, an administrative services officer and Assistant Commissioner for Human Resources in the Aviation Department – does not support the plaintiff's version of his hiring. (*Pl.Rsp.*, ¶ 11; Ex. 7, McCarthy Dep. at 30-33). It was Mr. Broderick and Mr. Smith, not Mr. McCarthy, who were involved in his hiring and who purportedly made the statements about budgetary insufficiency. Mr. McCarthy testified as to the circumstance of Paul Volpe, who was an Assistant Commissioner, who was promoted to Deputy Commissioner. (McCarthy Dep. at 30-33). There is no proof that the creation of that position was not consistent with budgetary guidelines, and there is no proof that Mr. Volpe was hired for a "temporary position," the situation he says his was.

20

in the employment records of the City – and the position he held himself out as having at various times after he was hired. Indeed, his contention that the Director's job he agreed to take was "temporary" is a virtual admission that he was hired into *that* job and not the job of Assistant Commissioner. Upon his return he resumed his title and job as Director, and there is no claim that the duties of and the authority inherent in that job varied materially – indeed at all- from those of Assistant Commissioner or that there was a salary differential. Thus, the ultimate argument here involves a difference in titles, which under Mr. Maher's proof, is a quiddity.[15] *See Grayson v. City of Chicago*, 317 F.3d 745, 750 (7th Cir. 2003)(the mere change of a job title, without more, does not constitute an adverse employment action); *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001).

While Jerome Smith testified that he thought "Assistant Commissioner" might have been plaintiff's formal *title*, it was "all kind of cloudy to" him. At best, this testimony creates a "metaphysical doubt," which is insufficient to create a genuine issue of material fact. *Matsushita Elec.*, 475 U.S. at 586. Equally insufficient to raise a genuine issue of disputed fact on the question of whether Mr. Maher was "hired into the position of Assistant Commissioner" is Judith Hamill's claim that she was told the plaintiff was an Assistant Commissioner of Finance. By whom, she does not say. Thus, apart from being hearsay, Rule 801(c), and thus not competent to oppose a motion for summary judgment, her testimony is irrelevant under Rule 401, Federal Rules of Evidence. Indeed, the structure of Ms. Hamill's affidavit suggests that it was Mr. Maher who made the statement.

Ms. Hamill's claim that she observed plaintiff exercising authority and responsibilities that were

---

[15] In 1993, Mr. Maher's gripe to Mr. Murphy was not about his job, but about his insistence that his permanent *title* be Assistant Commissioner or Director of Revenue

21

"commensurate" with the position of Assistant Commissioner fares no better. She does not say that those duties were unique to that position. Quite the contrary; she concedes that the duties in the Department of Aviation "can vary widely." (Hamill Aff.¶¶ 8, 17). The inherently equivocal nature of her testimony is illustrated by the *Sacco and Vanzetti* case. There, Captain Proctor, a ballistics expert, was unable to say that the 38-caliber bullet that killed a bank guard came from Sacco's 38-caliber pistol. And so, it was decided that he would testify that it was "consistent with" having been fired from that gun. The prosecutor (falsely) argued and the jury (incorrectly) inferred that the bullet in fact came from Sacco's pistol. Frankfurter, The Case of Sacco and Vanzetti, 79-81 (1927).

Of course, this is not to suggest any impropriety in Ms. Hamill's testimony. It is rather, to demonstrate that her affidavit leaves the whole matter indeterminate. To permit Ms. Hamill's affidavit to be used to support the inference that Mr. Maher was hired as an Assistant Commissioner is to invite the very speculation and conjecture that summary judgment does not allow: "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

On February 6, 1991, Mr. Maher submitted to Mr. Franke a request for administrative leave to attend a funeral. Under his name appears the words, "Assistant Commissioner." (Ex. 3 to Maher Aff.). The request purportedly bears the signature of Commissioner Jay R. Franke as the approving officer. On February 13, 1991, Mr. Maher submitted to Mr. Franke a request for a leave of absence because of an involuntary recall to active duty in Operation Desert Storm. Next to the word "title," there appears "Asst. Commissioner." These documents do not prove that Mr. Maher was hired as an Assistant Commissioner, only that he chose to use the title twice, thereby corroborating that which for summary judgment purposes needs no corroboration, namely that he and Smith had discussed the *title* of assistant commissioner. The

22

same analysis applies to the letterhead and business cards identifying Mr. Maher as "Assistant Commissioner." He does not say that they were ever used or when they were printed or at whose order. Like the other documents, they are out-of- court assertions by Mr. Maher that he was the Assistant Commissioner, no different than if Mr. Maher had told a co-worker of his claimed status.

Finally, Mr Maher's own proof demonstrates an absence of a genuine issue of fact on the question whether the alleged failure of the City to have made Mr. Maher an Assistant Commissioner in 1991 was caused *solely* by his military service as VRRA requires. *Monroe v. Standard Oil Co.*, 452 U.S. at 559. According to Mr. Maher, budgetary constraints persisting through 1991 precluded his hiring as an Assistant Commissioner. That being the case, the City's claimed infraction of VRRA in 1991 could not have been based "solely" on his military service in the Gulf.

In sum, there is no genuine issue of fact regarding Mr. Maher's claimed demotion in 1991, and the City is entitled to partial summary judgment on the 1991 demotion claim. *See discussion in Capitol Records, Inc. v. Progress Record Distributing*, 106 F.R.D. 25, 28 (N.D.Ill. 1985). Perhaps the result would be different if the theory were that the City had failed to abide by a promise that Mr. Smith had made within the actual or apparent scope of his authority. But that is not the theory advanced with such clarity by Mr. Maher, who after all is the master of his own complaint. *Dreamscape Design Inc., v. Affinity Network, Inc.*, 414 F.3d 665, 673(7th Cir. 2005).

## 2.

In addition to his demotion claim, plaintiff submits that he was harassed as a result of his deployment to the Gulf. Harassment on account of prior military service can be a violation of USERRA. *Peterson v. Dept. of Interior*, 71 M.S.P.R. 227 (M.S.P.B. 1996). To be actionable, "[s]uch a claim must be supported

23

by evidence that the employer's conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Miller*, 281 F.3d at 653. Some of the factors that must be considered in assessing a claim of harassment "are the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance." *Id.*

Mr. Maher does not claim that the harassment – which apparently consisted of frequent squabbles with Mr. Smith – was physically threatening or that it was severe enough to interfere with his work performance. In fact, his allegations do not even rise to the level found insufficient in *Miller,* where the plaintiffs were subjected to pressure to either resign their positions or give up their military status. In addition, some were harassed about absences and sick leave, and at least one was suspended and wrongfully deprived of vacation pay – a deprivation Mr. Maher does not claim he suffered. Under *Miller*, Mr. Maher's claims of post-October, 1991 - December, 1992 harassment, standing alone, is not actionable under VRRA.

This does not mean, however, that the conduct about which he complains is not part of the ongoing alleged pattern of harassment, the actionability of which must be determined by a contextual, not an atomistic analysis. Phrased differently, the question ultimately is whether the cumulative effect of all the harassment is actionable. *See Diaz-Gandia*, 90 F.3d at 615.[16]

---

[16] Even if the complaint had been set forth in counts, and summary judgment were granted on a particular count, the evidence would nonetheless be admissible on those counts that were still in play. *See Geldon v. South Milwaukee School District*, 414 F.3d 817 (7th Cir. 2005); Rule 404(b), Federal Rules of Evidence.

24

**B.**

## The Reorganization Of The Aviation Department In 1993 And The Plaintiff's Claims Of Post-Reorganization Demotion and Harassment

**1.**
### The Claimed Harassment

In early 1993 when the Aviation Department was reorganized, the plaintiff began reporting to a new supervisor, Hugh Murphy, who, he claims, harassed him regarding his military service commitment, did not respond when plaintiff requested that his permanent title be Assistant Commissioner or Director of Revenue, and had one of his assistants jam plaintiff's office with files to the point where he could not open the door. *See Diaz-Gandia*, 90 F.3d at 611 (summary judgment improper where harassment consisted, *inter alia*, of assignment of plaintiff for one month to a cubicle filled with boxes and office supplies but no desk or chairs). Things were no better when in October, 1993, the plaintiff began reporting to Dwayne Hawthorne, who disparaged the military, told plaintiff he was too old to be in the military, harassed him when he went on active duty, refused to do anything about the files stacked in the plaintiff's office, and hectored plaintiff continuously when he was doing a leadership course for the Naval Reserves.

These sorts of comments by supervisory or managerial personnel are direct evidence of a reservist-based discriminatory animus on the part of the employer. *See Diaz-Gandia*, 90 F.3d at 615-16; *Harris v. City of Montgomery*, 322 F.Supp.2d 1319, 1325 (M.D.Ala. 2004); *Mills v. Earthgrains Baking Co.*, 2004 WL 1749500 at *4 (E.D.Tenn. 2004); *Smith v. School Board of Polk County, Fla.*, 205 F.Supp.2d 1308 (M.D.Fla. 2002)(comments by supervisor sufficient to show that employee's reserve status was a motivating factor in certain conduct); *Gillie-Harp v. Cardinal Health, Inc.*, 249 F.Supp.2d 1113 (W.D.Wis. 2003)(supervisor's hostile comments about plaintiff's requests for military leaves along with other

25

evidence precluded summary judgment). Indeed, even less pointed comments can support the inference of impermissible animus. *Cf. Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002)(inference of discrimination from evidence that plaintiff was told to deduct military leave from his vacation time and that future leave orders would not be honored).

But neither VRRA nor USERRA punishes intent alone. To be actionable, there must be an employment action, and it must be "materially" adverse, meaning more than "a mere inconvenience or an alteration of job responsibilities." *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999). As the Seventh Circuit has explained, "a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.*

Perhaps standing alone, the claimed harassment between the plaintiff's deployment to the Gulf in 1991 and what occurred following the reorganization of the Aviation Department in 1993 still might not rise even to the level found insufficient in *Miller.* However, the evidence must be considered as part of a more encompassing and protracted course of conduct discussed by Mr. Maher.

## 2.
## The Claimed 1993 Demotion

With the reorganization of the Aviation Department in 1993, the plaintiff's job title changed to Manager of Finance. He remained a grade 19 and received another $6,000 raise in salary to $54,840 per year. Curiously, while claiming that he was demoted in 1993, the plaintiff inconsistently argues that his title of Director of Aviation Revenue did not change. He continued to refer to himself in memos as Director of

Aviation Revenue or Director of Revenue. What then the demotion consisted of remains a mystery: his salary increased, his title did not change, his duties remained constant, and the number of people he directly supervised almost tripled.

The only response to the evidence is Mr. Maher's denial and his insistence that he was demoted. Not only is this conclusory response inadmissible, it constitutes an admission under Local Rule 56.1(b)(3). *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir.1995) (failure to properly contest factual assertions under local rules constitutes binding admission of those facts). As such, there is no genuine issue of fact that plaintiff's salary, benefits, and responsibilities were not adversely affected during the reorganization of the Aviation Department. Assuming that Mr. Maher's insistence that his job title did not change is sufficient to create an issue of fact that it did, the mere change of a job title, without more, does not constitute an adverse employment action. *Grayson,* 317 F.3d at 750; *Stutler,* 263 F.3d at 703).

Seemingly abandoning any claim that he was actually demoted during the reorganization, plaintiff instead submits that when his title changed from the director level to manager of finance, he was locked into a *lower* pay grade. Again, there is only the plaintiff's "self-serving" conclusion. The admissible evidence demonstrates that his pay grade was not lowered, but remained at a grade 19, which is one of two levels for director level positions within the Aviation Department, according to the plaintiff's own submission. The only support for the "lower pay grade" claim is the plaintiff's deposition testimony, which deals not with the title change, but his claim that he was hired as assistant commissioner from the start of his employment and how superior he was to his colleagues and thus, should have been promoted over them. (*Pl.Rsp.*, ¶ 33; Ex. 6, Plaintiff Dep. at 361-62).

Mr. Maher claims that people refused to respond to requests for information necessary to complete

27

his work; he was not invited to meetings concerning subjects that directly involved his areas of responsibility; former friends began to shun him; and his isolation increased after deployments and has continued to the present time. These allegations are unamplified, are insufficient in and of themselves, and ostracism by co-workers is not enough to constitute an adverse employment action. *Stutler,*, 263 F.3d at 704; *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998). Moreover, there is no proof that Mr. Maher has been shunned because of his military service, and inferences that are supported only by speculation or conjecture will not defeat a motion for summary judgment. *McDonald v. Village of Winnetka*, 371 F.3d at 1001.

Mr. Maher's affidavit is also replete with hearsay – "I was made aware that I had been excluded from the list of policymaking personnel" and statements made on information and belief–"I was stricken from the list and the City no longer requires me to file a statement of economic interest because my position no longer entails policymaking authority, and the City has filled multiple positions for which I am well-qualified including my former position of assistant commissioner." The use of the City's pay grade scale purportedly to show that the plaintiff is locked in to an inadequate pay scale also fails because the assertions regarding it are admittedly based on information and belief, as opposed to the personal knowledge required by Rule 56(e), *Johnson v. Nordstrom, Inc.*, 260 F.3d at 736.

In sum, the City is entitled to partial summary judgment on the 1993 demotion claim.

## C.
## The Plaintiff's Deployment In 1996 To Bosnia And His Claim That He Was Not Promptly Reinstated To His Former Responsibilities Upon His Return [17]

On August 2, 1996, plaintiff was informed that he was being called to active duty in Bosnia. He

---

[17] This claim is governed by USERRA.

28

immediately notified the City and was promptly told by Mr. Hawthorne that he "should quit his job" and how unfair it was to the City for him to have volunteered for the mission. Between August, 1996 and May, 1997, when Mr. Maher returned from active duty, his responsibilities had been taken over by Jeff Crosby, his Assistant Manager. In the approximately ten weeks it took to restore the plaintiff's responsibilities following his return to work, he was given duties that were "clerical in nature." *Cf. Diaz-Gandia*, 90 F.3d at 616 (employer failed for a total of five weeks during a ten-week period following employee's return from military service to assign work responsibilities to plaintiff).

Upon his return to work in May, 1997, plaintiff met with Robert Repel, First Deputy Commissioner of Legal Affairs, to discuss his claimed lack of promotion and his desire to be promoted to Deputy Commissioner, as well as a number of other positions. Mr. Repel said he "really in good conscious [sic] couldn't recommend [him] for either a deputy commissionership or assistant commissionership [as]... it would not be fair to promote plaintiff because someone else had to do his job while he was 'off gallivanting in Bosnia.'" This comment is admissible not only on Mr. Maher's failure to promote claim, but on the claim he was not promptly restored to his former job when he returned from returned to work.

On July 23, 1997, Mr. Maher's former duties were restored by Mr. Hawthorne, with the exception of two projects that plaintiff no longer supervised and with the loss of two of his subordinates, who were responsible for those projects and who continued to report to Mr. Hawthorne. Mr. Maher's salary, benefits, and pay grade were not decreased. The burden will be on the plaintiff to show that the ten-week interval between his return and the resumption of full responsibilities is actionable under USERRA. That is, that his status as a reservist was a motivating factor in the delay. *Cf. Akhdary v. City of Chattanooga,* 2002 WL 32060140 at \*8 (E.D.Tenn. 2002).

Under USERRA, an employer must promptly reinstate a person returning from a period of service

as soon as practicable under the circumstances of the case. *Rogers v. City of San Antonio*, 392 F.3d 758,

763 (5th Cir. 2005). In *Rogers*, the Fifth Circuit looked to the Department of Labor's proposed regulations

implementing USERRA for the following guidance as to what could be considered prompt reinstatement:

> For example, prompt reinstatement after "weekend National Guard duty generally means
> the next regularly scheduled working day." However, prompt reinstatement after "several
> years of active duty may require more time, because [the] employer may have to reassign
> or give notice to another employee who occupied [the] position."

*Rogers*, 392 F.3d at 763 (*quoting* Regulations Under the Uniformed Services Employment and

Reemployment Rights Act of 1994, as Amended, 69 Fed. Reg. 56266 (2004)(to be codified at 20 C.F.R.

pt. 1002)(proposed September 20, 2004)). The legislative history of the USERRA contains similar

language:

> The provisions of section 4313 require prompt reinstatement. The Committee recognizes
> that what is prompt depends on the circumstances of each case. However, reinstatement
> after weekend National Guard duty would, in most cases, be the next scheduled working
> day, while reinstatement after five years on active duty may require giving notice to an
> incumbent employee who may have to be "bumped." The Committee intends that any undue
> delay in reinstatement would be subject to a claim for lost wages.

In light of all that had occurred since 1991, there is sufficient evidence from which a rational jury

could infer that the delay was purposeful and excessive. Since Mr. Maher ultimately was reinstated to his

former position, and since he apparently suffered no financial damage as a consequence of any delay in

reinstatement, the chief utility of this incident is its evidentiary value in the overall mix of claimed misconduct.

*Cf. Manuel v. City of Chicago*, 335 F.3d 592, 596 (7th. Cir. 2003); Rule 404(b), Federal Rules of

Evidence.

Of course, the City will be free to demonstrate that in the nine months that Mr. Maher was in Bosnia,

it was essential to reassign the personnel and transfer certain projects. There will be adequate opportunity for the jury to learn about the nature of the reassigned projects, the identity and importance of the two subordinates who were reassigned, the overall significance of the projects, how close they were to completion, the number of other projects whose supervision Mr. Maher reassumed, the number of projects under his control upon his resumption of his former duties, and any other relevant facts from which it could be concluded that the reassignment was appropriate and not improperly motivated.

## D.
## The 1998 Transfer Of The Plaintiff To Landside Operations

About seven months after his conversation with Mr. Repel, Mr. Maher was transferred to Landside Operations in the Department of Aviation, and his files were transferred to John Gill. The plaintiff contends that he has been "exiled" to Landside Operations and virtually stripped of his prior responsibilities. He no longer has any subordinates reporting to him. The City claims that plaintiff's duties at Landside Operations are policy and operational based. Mr. Maher denies this, although he conceded that his duties are many and varied. His supervisor in Landside Operations, John Plezbert, told him that management deemed him a troublemaker, and counseled him to "wait it out" until management changed. (Plaintiff Dep. at 249-50). Mr. Plezbert's statements are hearsay and may not be considered.

For the first time, in response to the City's motion for summary judgment, the plaintiff contends that this series of events constitutes a demotion. Although there is authority that the argument comes too late, *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 606 (7th Cir.2000); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996)("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *Cebertowicz v. Motorola, Inc.*, 178 F.Supp.2d 949, 953

31

(N.D.Ill. 2001)(Shadur, J.), the importance of the interests at stake counsel against a finding of waiver.

An adverse employment action is something more than a mere alteration in job responsibilities. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999). For a job change to be a tangible adverse action, it must be accompanied by a decrease in wage or salary, a less distinguished title, a material loss of benefits, *significantly diminished material responsibilities*, or other indices that might be unique to a particular situation. A temporary change in job responsibilities or a change that does not significantly diminish responsibilities does not qualify. *Quantock v. Shared Marketing Services, Inc.*, 312 F.3d 899, 903 (7th Cir. 2002). While the definition of an adverse employment action is not limited to a loss of salary or benefits – which the plaintiff admittedly did not suffer – it is not so broad as to include "everything that makes an employee unhappy." In other words, the adverse action must *materially* alter the terms and conditions of employment. *Stutler*, 263 F.3d at 703; *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004)(loss of some supervisory responsibilities by being relegated to "random tasks of supervising" not adverse employment action); *Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir.2000)(rejecting plaintiff's argument that being "moved from an interesting job she liked that involved overseeing several other people to a boring job she didn't like and that lacked any supervisory duties" was an adverse employment action).

In light of the mosaic of evidence in the case, including Mr. Repel's comments, there is a genuine issue of material fact on the question of whether the plaintiff's transfer is a demotion, and whether Mr. Maher's participation in the military was a motivating factor in that transfer.

### E.
### The Plaintiff's Claim That The City Failed To Promote Him While Promoting Those Less Qualified Than He

Finally, there is the claim that, since May of 1991, Mr. Maher has not been appointed to a higher

32

position or promoted, while others less qualified have been. He attributes the stagnancy of his career to his participation in the military. [18] The initial burden is on Mr. Maher to demonstrate under VRRA the existence of a genuine issue of fact that between 1991 and December, 1994, the sole reason for his non-promotion was his military service. Between December, 1994 and the filing of the suit, Mr. Maher must show under USERRA that his participation in the military was a motivating factor in the City's failure to promote him. *See Akhdary*, 2002 WL 32060140 at *8.

The City has made no attempt to explain why Mr. Maher has not been promoted beyond the contention that the positions he sought were "*Shakman* exempt." Apparently the argument is that Mr. Maher could not have gotten these jobs in any event, and that the grant of summary judgment is appropriate. But to say that some or all of the positions fell within this category is merely to recognize that they were not merit-dependent or merit-based, and that purely political considerations could be employed in hiring without running afoul of the *Shakman* consent decree. *See Cygnar v. City of Chicago*, 865 F.2d 827, 846 n.19 (7th Cir. 1989). It does not mean that merit did not count, that merit was a disqualifying factor, that Mr. Maher was not even eligible to apply, or that he could not under any circumstances obtained one of the positions. Perhaps that is the case. But, the City has made no such showing.

The difficulty for the plaintiff lies not so much in the nature of the jobs for which he claims he was qualified, but in the weakness of the documentary evidence on which he relies. While he claims there is a "list of positions" or a "number of positions," for which he says he was qualified and for which he claimed he applied and was rejected, including the position vacated by Mr. Smith (*Pl.Rsp.*, ¶ 53, Plaintiff's Dep. at

---

[18] Mr. Maher's several attempts to obtain employment outside the City were unsuccessful. (*Pl.St.*, Ex. 15).

151-53), the purported list, Exhibit 14, is inadmissable. Exhibit 14 is a 70-page deposition transcript of Mr. Cummings. (*Pl.Rsp.*, ¶ 57, Ex. 14). Local Rule 56.1(a)(3) requires a specific citations to the record, not an indiscriminate citation to a lengthy exhibit. *Ammons v. Aramak Uniform Services, Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). It is the parties' duty to support their arguments properly, and it is not for a court to search for a disputed issue of fact if there is a factual contention not adequately supported in the record by citation to admissible evidence. *Roger Whitmore's Automotive Services, inc., v. Lake County*, 424 F.3d 659, 664 n. 2 (7th Cir. 2005). Referring indiscriminately to a 70-page exhibit does not comport with this obligation. However, viewing the evidence in a light most favorable to the plaintiff, there is Mr. Maher's testimony that he did apply for positions and was rejected. While that kind of unamplified contention may not persuade a jury, it is enough – although just barely – to create a genuine issue of fact regarding his applications for promotion.

There are two specific instances to which Mr. Maher does point, where he claims less qualified individuals were promoted over him. John Volpe was promoted from Assistant Manager of Finance, to Manager, and then to Deputy Commissioner. (*Pl.St.*, ¶ 18; *Def.Rsp.*, ¶ 18). According to the plaintiff, Mr. Volpe was not as qualified for promotion as was he because, unlike the plaintiff, he has no degree in finance or accounting. (*Pl.St.*, ¶ 18). Objections to this *non-sequitur* crowd the mind. First, it is not supported by admissible evidence since it is based on information and belief and thus clearly insufficient to create a genuine issue of material fact. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 736 (7th Cir. 2001). The same defect exists regarding Bea Hickey, who was promoted from the administration operations section to the revenue section and then to Director of Revenue for the City.

Second, even if one were to assume that Mr. Volpe and Ms. Hickey lacked the undergraduate

degree Mr. Maher finds so critical, it does not follow that there is a genuine issue of fact that Mr. Maher was more qualified than they. Who is the most well-qualified candidate for a particular job is a function of a delicate assessment of a host of imponderables, perhaps the least of which is one's undergraduate degree. The standards in these sorts of cases are rigorous because differences in qualifications are inevitably subjective, and are generally not probative of discrimination unless the disparities are so palpable and so undeniable as measured by any objective standard that no reasonable person could have chosen the person selected over the one rejected. *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 356, 357 (5th Cir. 2001). Thus, claimed superior qualifications of the unsuccessful applicant are not enough in themselves to support an inference that a defendant made its hiring decision based on a statutorily impermissible basis. *See Cardoso,* 427 F. 3d at 436; *Hall v. Babb,* 389 F.3d 758, 763 (7th Cir. 2004).

All Mr. Maher has shown is that he has an undergraduate degree that two others may not. This proves nothing, even if it were permissible to take the evidence to the outermost reaches of conjecture. Federal courts are not super-personnel departments, intervening whenever an employee feels ill-treated. Employers can and often do make hiring decisions that may, by objective standards, be improvident. Title VII, does not create a regime of court-enforced merit selection. *Cardoso v. Robert Bosch Corp.,* 427 F.3d 429, 436 (7th Cir. 2005); *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 74 (1st Cir. 2003). Neither does VRRA or USERRA.

Finally, Mr. Maher's conclusion that the City promoted individuals less qualified than he suffers from the flaw that a plaintiff's conclusion that he is more qualified than someone else is self-serving, and the cases are uniform in prohibiting this kind of self-assessment from creating a genuine issue of material fact. *See, e.g., Cardoso,* 427 F. 3d at 435; *Solorzano v. Shell Chemical Co., 254* F.3d 1082 (5th Cir. 2001);

*Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996); *Rudin*, 420 F.3d at 727, n.10; *Butts*, 387 F.3d at 925.

Thus, if there were no other evidence, it would be necessary to grant partial summary judgment on the failure to promote claim. However, there is other evidence that, if believed, is singularly probative on the question of why Mr. Maher was not promoted – as well as on his claims of harassment, and hostile work environment. *See* Rule 404(b). Mr. Maher has sworn that he had a series of conversations in 1993, 1994, 1995, and 1997 with high-ranking Department officials, including Messrs. Repel, Cummings, and McCarthy, who told him that he was not being promoted because of his military service. Mr. Repel's comments in 1997 are particularly revealing. He (according to the plaintiff) said he "really in good conscious [sic] couldn't recommend [him] for either a deputy commissionership or assistant commissionership [as]. . . it would not be fair to promote plaintiff because someone else had to do his job while he was 'off gallivanting in Bosnia.'" *Cf. Diaz-Gandia*, 90 F.3d at 615 (Plaintiff told by supervisor that the reason he had no telephone was that he was "on one of those damn military leaves" when the phones were installed). When Mr. Maher complained to Mr. McCarthy about his conversation with Mr. Repel, he was told there was nothing that could be done.

These were not stray remarks in the workplace or statements by lower level employees. They are admissible under Rule 801(d)(2)(C) or (D) and are direct evidence that the allegedly discriminatory conduct was animated by Mr. Maher's involvement in the military. *See supra* at 19, 24; *Diaz-Gandia*, 90 F.3d at 615; *Williams, supra; Fink,* 129 F.Supp.2d at 520-21(USERRA); 5 McLaughlin, Weinstein's Federal Evidence §801.33[2][c] (2d ed. 2005). *Cf., Volovsek,* 344 F. 3d at 690(supervisors' comments sufficient to preclude summary judgment in gender discrimination case).

36

Whether these statements were made and the significance to be attributed to them is for the jury to determine. *Volovsek*, 344 F3d at 690; *Akhdary*, 2002 WL 32060140 at *3 (USERRA). For now, it must be presumed that they were, and they are enough to require denial of the motion for summary judgment on the failure to promote claim.[19]

## VI.
## THE DOCTRINE OF LACHES BARS ONLY THE 1991 DEMOTION CLAIM

We come then to the City's contention that there has been a fading of witnesses' memories and therefore, the doctrine of laches bars the amended Complaint in its entirety.[20] The doctrine is applicable in USERRA cases. *Miller v. City of Indianapolis, supra; Akhdary*, 2002 WL 32060140 at *7. But merely showing some dimming of memories, even in conjunction with an extraordinary delay on the part of the plaintiff in initiating suit, is not enough to trigger the doctrine. *See, e.g., Leonard v. United Airlines*, 972 F.2d 155, 1159 (7th Cir. 1992)(denying claim of laches even though "memories have dimmed"). The passage of time dulls all memories to some degree and makes proof of any fact more difficult. *Dickey v. Florida*, 398 U.S. 30, 42 (1970)(Brennan, J., concurring). That is why, in part, there are statutes of limitations. *Hirschberg v. CFTC*, 414 F.3d 679, 685 (7th Cir. 2005).

The defense of laches requires proof of lack of diligence by the party against whom the defense is

---

[19] Mr. Maher's renditions of his conversations require no corroboration. It would be odd indeed if, to avoid summary judgment (with its requirement of proof by a preponderance), a party were required to corroborate his testimony about what was said to him by the defendant in order to avoid the prohibition against self-serving evidence, when a defendant in a criminal case may, consistent with the requirement of proof beyond a reasonable doubt, lose his liberty (or his life) on the uncorroborated testimony of an admitted perjurer, a convicted felon, or an accomplice. *United States v. Wallace*, 32 F.3d 1171, 1173 (7th Cir. 1994).

[20] Although the City has treated the amended complaint as a whole, the required analysis must be more focused. For example, the 1991 demotion claim need not suffer the same fate as the harassment claim and the 1998 transfer/demotion claim.

asserted and material prejudice to the party asserting the defense. *State of Kansas v. State of Colorado*, 514 U.S. 673, 687 (1995). The doctrine is applied on a sliding scale: the longer the delay, the less the prejudice that must be shown. But there still must be prejudice, and it must be material. *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003)(8 ½ year delay, with resulting destruction of documents, loss of witnesses, and inability to remember the specific details of the plaintiff's employment).

Mr. Maher's explanation for the protracted delay in failing to bring suit during what he has described as a twelve year odyssey of harassment and condemnation is that he feared further retaliation – a not uncommon justification for delay, *Akhdary* 2002 WL 32060140 at *7 – and that he was lulled by the City's assurances that matters could be resolved short of litigation and that all would be well if only he would be patient.[21] Of course, at some point, hope no longer springs eternal, and failure to take action makes inequitable the prosecution of a claim.

The assurances by the City very early on in the plaintiff's employment that things could be worked out might, for a time, have lulled Mr. Maher. But, those assurances quickly became "a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards v. California*, 314 U.S. 160, 186 (1941) (Jackson, J., concurring). By 1993, despite having dismissed his

---

[21] *But compare Smith v. City of Chicago*, 769 F.2d 408, 413 (7th Cir. 1985)("A would-be plaintiff may not grant himself additional time to file suit just because he fears new wrongs and distrusts the ability of the court to protect him from unlawful retaliation."). *Shaw v. Autozone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999), on which the City relies, did not deal with laches, but with the affirmative defense to sexual harassment announced in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), that the employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." *Shaw*, 180 F.3d at 813. In that context, the Seventh Circuit held that "[w]hile a victim of sexual harassment may legitimately feel uncomfortable discussing the harassment with an employer, that inevitable unpleasantness cannot excuse the employee from using the company's complaint mechanisms." *Id.* The City does not identify formal mechanisms that Mr. Maher avoided, and the record demonstrates that he made complaints to supervisory officials.

38

Department of Labor complaint, he was being told by Mr. Cummings, the Assistant Commissioner of Personnel, that his military service was preventing him from being promoted. By 1995, he was told that his service rendered him unpromotable. And still he did nothing. Under these circumstances, Mr. Maher's failure to sue was unreasonable. *Akhdary, supra.*

By early 1998, he had been, to use his word, "exiled" to Landside Operations and relegated to a job with no subordinates and no supervisory or policy-making responsibilities, and his professional dues had been cancelled. Things could scarcely have been bleaker – if he is to be believed. Five more years passed before suit was filed. If "5 years. . . seems like a long time to wait to prosecute" a claim of demotion in 1998, *Miller*, 281 F.3d at 653, waiting eight to thirteen years to prosecute the other claims is unfathomable. Thus, the question is not whether the delay was inexcusable – *see G. D. Searle & Co. v. Cohn*, 455 U.S. 404, 411 (1982); *Miller*, 281 F.3d at 653; *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir. 1988) – it plainly was. Rather, it is whether the City has shown sufficient prejudice from the delay to warrant dismissal of Mr. Maher's various claims.

In *Miller*, the defendants were prejudiced because the two individual who allegedly discriminated against the plaintiff were deceased and others had retired. The only meaningful prejudice that the City has been able to identify is that involving Mr. Smith's memory. The first of the claims is the 1991 demotion. Mr. Smith, Mr. Maher's supervisor, said that he did not do routine written evaluations for any of his directors.[22] He said that he could not remember: any of the details of Mr. Maher's performance, who Mr. Maher supervised, what his supervisory duties consisted of, and what occurred during the 1990 interview.

---

[22] The City has not claimed that there were performance evaluations that were destroyed as a result of Mr. Maher's delay in bringing suit.

(*Smith Dep.* at 13-15, 29-30, 40-41, 47). This is sufficient prejudice to warrant application of the doctrine of laches to the 1991 demotion claim.[23]

Mr. Cummings' inability to recall to whom Mr. Maher directly reported when he was Manager of Finance is not materially prejudicial to the City. (*Def.St.* at ¶59(c)). He worked in personnel, and the City does not claim that there are not other witnesses and documents who and which can explain to the jury the Department's structure. Mr. Cummings did recall that Mr. Maher constantly complained about harassment and being demoted, when, in Mr. Cummings' view, he had not been. (*Cummings Dep.* at 41-42). Finally, Mr. Maher's sister's inability to remember whether her brother related to her conversations he had with Mr. Hawthorne could scarcely be less harmful to the City. (*Pl.St.* at ¶59(b)). Not surprisingly, the City does not pause to explain how her lack of memory has anything to do with the case or affects in any way its ability to defend against the charges.

Even if she recalled that Mr. Maher had not related the conversations he now insists occurred, that omission would not be admissible impeachment, unless he told her about all or most of the other conversations and incidents involved in the case. Absent that, his failure to have repeated the Hawthorne conversations would be irrelevant, and the evidence inadmissible. *See* Rules 401 and 402, Federal Rules of Evidence. If he had been an otherwise faithful chronicler, the worst that can be said is that the City has lost some minimal, possibly impeaching evidence. But this is not prejudice of a sufficiently material nature to warrant dismissal of any aspect of the case. If, on the other hand, he had told her about the Hawthorne conversations, her faulty memory redounds to the City's benefit, for it precludes any attempt by Mr. Maher

---

[23] Mr. Smith's claim that he could not recall whether he made the allegedly harassing statements attributed to him by Mr. Maher is not a basis for application of the doctrine to the harassment claim, and Mr. Smith was not the only alleged harasser. There is no claim that the others have a faulty memory.

to resort to the prior consistent statement doctrine as a basis for her to repeat what he told her. *See Tome v. United States*, 513 U.S. 150 (1995); *United States v. Kenyon*, 397 F.3d 1071 (8th Cir. 2005).

In short, the only prejudice to which the City can point (other than Mr. Smith's failed memory) is insignificant and relates to matters with minimal or no importance to the case, and/or which can be proved in other ways by other people.

## CONCLUSION

For the foregoing reasons, the motion of the City of Chicago for summary judgment [#30] is GRANTED in part and DENIED in part.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/3/06

41